No. 18,324.

SCIENTIFIC SUPPLY CO., INC. *v.* MAX A. ZELINGER.
(341 P. [2d] 897)

Decided July 6, 1959. Rehearing denied August 3, 1959.

Messrs. WORMWOOD, O'DELL & WOLVINGTON, for plaintiff in error.

Messrs. ROTHGERBER, APPEL & POWERS, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE KNAUSS delivered the opinion of the Court.

PLAINTIFF in error, defendant in the trial court, is the manufacturer and distributor of an insecticide known as "Control 56." Defendant in error, plaintiff below, was the manager of the Ellis Canning Company, a food canning and processing corporation located in Denver. We will refer to the parties as they appeared in the trial court where plaintiff had judgment against defendant

for damages allegedly resulting from inhaling the fumes of defendant's insecticide. Defendant is here on writ of error seeking reversal.

For more than a year prior to the event resulting in this action, the Ellis Canning Company had used defendant's product in the control of flies and other insects in its plant. The spraying device used in connection with the insecticide was also distributed by the defendant. On a Saturday in September, flies becoming a problem, the plaintiff undertook to use the spraying device to eradicate flies from the offices of the corporation. He had the foreman of the plant, who through use of the device had become familiar with its operation, prepare the machine for him and advise him as to its use. The evidence discloses that the spraying machine when in operation produces a fog which permeates cracks and crevices, killing flies and other insects on contact. When a room is treated, such as the offices here, the purpose is to create a fog of sufficient density to reach all insects wherever they may be hidden. The plaintiff testified that he placed the machine in one of the offices, plugged it into an electric outlet and left the room. He permitted it to operate in that office for about fifteen minutes when he removed it to another and repeated the operation. He treated a total of four offices, and it was shown that upon entering an office to shut off the machine the fog was so dense that he was unable to see and had to fumble around to find and remove the electric plug by which it was operated and for such period of time as was required to locate and remove the plug he was exposed to and inhaled the fumes. Having completed spraying the offices about noon of that day, he left the plant; played golf in the afternoon and pursued his normal activities in the evening, feeling no ill effects from his operations of the morning. During the night he was awakened with severe pains in his left arm and chest and had difficulty breathing. Early Sunday a doctor was called who gave him an injection to relieve the pain, some pain relieving

pills to carry him through the day and night and arranged an appointment at the doctor's office for Monday morning. On Monday an electrocardiogram was taken and plaintiff removed to a hospital where x-rays and other diagnostic tests were had. It was found that plaintiff was suffering from a pleuritic inflammation of the lung, probable inflammation of the heart lining and pericarditis. These afflictions the doctor attributed to the inhalation of fumes of the insecticide on the Saturday preceding, there being no other source, in view of the plaintiff's prior good health, to which they could be attributed. There was no evidence, however, that the ingredients of Control 56, the insecticide used, were poisonous or harmful to human beings when inhaled. No medical expert testified that the formula involved was dangerous to humans or that exposure to it would result in afflictions such as suffered by the plaintiff. In fact the only expert who appears to have had sufficient background and experience to testify with any degree of certainty on the subject of the effect of such compounds, was Dr. Robert Franklin Bell, acting head of industrial medicine at the University of Colorado Medical School, who expressed the opinion that the inhalation of the fumes of Control 56 had no relation to the plaintiff's pericarditis or illness; that he had never seen any toxic reaction to the ingredients involved, nor had he heard of any such.

In this state of the evidence the trial court found for the plaintiff and fixed damages at $3,500.00, the court accepting as proof of the dangerous character of Control 56, the subsequent illness of the plaintiff, his conclusions resting largely upon the testimony of Dr. Kauvar, the attending physician, who could attribute the illness to no other cause, although he was obliged to concede that afflictions such as those experienced by plaintiff, that is pleurisy and pericarditis, may be due to a variety of other causes, and frequently to causes unknown.

We think that the liability of a defendant in

circumstances such as we have in this case, must be based upon something more than an assumption that because the plaintiff became ill following use of the defendant's product, the defendant was negligent in selling a dangerous substance or product without adequate warning of its lethal character. In reaching this conclusion the trial court pyramided assumptions one upon the other. First, that the plaintiff became ill following use of Control 56, hence Control 56 is a dangerous substance. Second, that Control 56 being a dangerous substance was the proximate cause of plaintiff's illness. Third, that the resulting illness following use of Control 56 establishes the negligence of the defendant. As we have pointed out, there is nothing in this record to support these assumptions. No witness testified that the product was inherently dangerous; the only evidence touching upon the point being that it was not. Certainly no presumption of negligence arises from the fact of illness following the use of an insecticide. Such products are in common use and as they are composed of a variety of formulas, the court cannot take judicial notice of an inherently dangerous character ascribed to such products. The rule applied in other types of negligence cases that the mere happening of an accident does not raise a presumption of negligence as stated in *Woolworth v. Peet,* 132 Colo. 11, 248 P. (2d) 665; *Perry Lumber Co. v. Ruybal,* 133 Colo. 502, 297 P. (2d) 531, and *National Construction Company v. Holt,* 137 Colo. 208, 322 P. (2d) 1046 is equally applicable to the circumstances disclosed by the record before us. The case of *Maize v. Atlantic Refining Co.,* 352 Pa. 31, 41 A. (2d) 850, cited by plaintiff and relied upon by the trial court is distinguished from the case at bar in that there the evidence was more than adequate to establish the dangerous and poisonous character of the chemical which resulted in the death of plaintiff's intestate, as well as to establish the liability of the defendant in negligently marketing the product without proper warning of its dangerous properties. The

chemical involved was carbon tetrachloride, the fumes of which are known to be dangerous when inhaled without adequate ventilation. The rule there announced, with which we find no fault, is as follows:

"Anyone who is responsible for the existence of a dangerous instrumentality or substance with which persons are likely to come in contact must take such reasonable precautions for their safety as are suggested by experience and the known dangers."

This standard of care is recognized and applied in the case of *Grange Mutual Fire Insurance Company v. Golden Gas Company,* 133 Colo. 537, 298 P. (2d) 950, where it is said:

"The evidence clearly shows that defendant was selling and dispensing a highly inflammable liquid that gassified upon contact with air. We think it is to be classified as a dangerous substance and handled with the care and caution commensurate with its dangerous character."

As we have seen the record here is totally devoid of evidence tending to show that Control 56 is dangerous to anything but flies and insects, or that if inhaled by human beings would be likely to cause serious disturbances of the vital organs.

Finding no basis in the evidence upon which the conclusions of the trial court can be sustained, the judgment is reversed and the cause remanded with directions to dismiss the action.

MR. JUSTICE MOORE and MR. JUSTICE FRANTZ dissent.

MR. JUSTICE DOYLE not participating.

MR. JUSTICE FRANTZ dissenting:

Zelinger sued Scientific Supply Co., Inc., for damages for personal injuries alleged to have resulted from the use of an insecticide produced and marketed by the defendant under the name, "Control 56." The acts of negli-

gence charged were: (1) the failure of the defendant to warn of dangers inherent in exposure to the product; (2) labeling the product as non-injurious to warm-blooded animals when in fact it could and did injure the plaintiff; and (3) that the product was mislabeled in violation of C.R.S. '53, 6-12-1, et seq.

Two problems developed, both presenting questions of proof. It is claimed that there was a lack of proof of ingredients harmful to man in the insecticide that was used, and a lack of evidence connecting the ingredients with the defendant's resulting injury.

There was evidence to support the findings and determination of the trial court. The fact that the evidence favorable to the defense seems much stronger to us should not induce us to reverse. The fact that the evidence favorable to the plaintiff's cause appears to be rather inconclusive, although in quantity greater than a scintilla of evidence, satisfies the rule that this court will not reverse where there is present sufficient evidence to support the trial court's disposition of the case.

For these reasons I must dissent.

I am authorized to state that MR. JUSTICE MOORE joins in this dissenting opinion.