Kenneth M. RUMSEY et ux., Appellants,

v.

FREEWAY MANOR MINIMAX et al.,
Appellees.

No. 14814.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Jan. 11, 1968.

Rehearing Denied Feb. 1, 1968.

Tommy R. Letbetter, Houston, Schmidt & Garrett, Houston, of counsel, for appellants.

Fulbright, Crooker, Freeman, Bates & Jaworski, Sam H. Hood, Jr., Gary B. Webb, Houston, for appellee Freeway Manor Minimax.

Wm. H. Shireman, Corpus Christi, for appellee Jett Echols.

BELL, Chief Justice.

Appellants sued Freeway Manor Minimax, a retail grocery store, herein called Minimax, and Echols Manufacturing Company, the manufacturer of "Echols Kingtex", a roach poison, herein called Echols, to recover damages resulting from the death of their three year old son, Bruce, who allegedly died as a result of ingesting some of the roach poison which contained thallium.

After appellants rested their case, the trial court sustained the motion of Minimax for an instructed verdict and at the conclusion of all evidence it instructed a verdict favorable to Echols. A judgment was rendered that appellants take nothing.

The appellants by point of error here assert liability on the part of Minimax, the retailer, on the ground of implied warranty.

Appellants assert liability on the part of Echols on the following grounds:

1. There was a fact issue as to whether Echols was negligent in the labeling of "Echols Kingtex".

2. There was a fact issue as to whether there was negligent failure to warn.

3. There was a fact issue as to whether there was a breach of express warranty.

4. There was a fact issue as to whether there was a breach of implied warranty.

As to both appellees it is asserted there was error in instructing a verdict because there was only a fact issue as to whether appellants were guilty of contributory negligence and whether they could not recover because of the doctrine of volenti non fit injuria.

The fundamental basis of recovery is that the label on the bottle purchased by Mrs. Rumsey did not contain a statement that there was no known antidote for thallium.

In May of 1961, Mrs. Rumsey purchased a one ounce bottle of "Echols Kingtex" from Minimax. A friend had told her she used this insecticide, so she decided to buy it. She had some roaches in the garage. She found it on the shelf and she read the label before she purchased it. She read

the antidote given, which was as follows: "Give a tablespoonful of salt in a glass of warm water and repeat until vomit fluid is clear. Have victim lie down and keep warm. Call a physician immediately! Warning: Cumulative Poison. Absorbed through the skin. Do not get in eyes, on skin or on clothing. Wash thoroughly after handling. Keep children and domestic animals away from baited areas and burn all pests killed." She relied on the label when she made the purchase. She also saw the crossbones and skull painted in red on the label. She also saw the word "Poison" written on the label in three different places. She knew this was something not to let children get into.

She, following directions on the label, filled small bottle caps—Seven-Up caps—and put them in the garage. The directions on the label that she was talking about read: "Place in small lids or beverage caps. Only a few necessary. Place in cabinets and closets where children and pets cannot reach. Place remainder in jar and use as needed. It is good as long as you have use for it." The caps with the poison would be placed at night around the garbage cans in the garage and she would then lock the doors. After picking them up from the floor she would place them on the back of a shelf. The shelf was about 4½ feet from the floor. She would put them at the back of the shelf that was about 8 inches wide. She was careful not to let Bruce know where they were. If her husband was home she had him keep Bruce while she put them out. If her husband was gone, she would put them out after Bruce had gone to bed. She had followed this procedure during the month of May and part of June.

On June 27, 1961, around 10 o'clock a. m., Bruce and a six year old boy, Mark Harris, came over to play. They played in the breezeway between the house and the garage. About 11 or 11:30 they went across the street to play in a swimming pool. He later played at another neighbor's house. About one o'clock Bruce had his lunch and then went outside. He came back and asked where his Seven-Up cap was. She asked him to show her what he meant. He took her to the garage and she saw the other two lids on the floor and the poison was spilled and she noticed Bruce had poison on his cheek and hands. She took him to the bathroom to wash the poison off and she found the other cap on the dressing table in the bathroom. She immediately went to her next-door neighbor and they immediately took Bruce to the doctor, who was about five minutes away. She didn't try the warm salt water first aid given on the label because she felt that would take longer than taking him to the doctor.

When the first doctor learned Bruce had eaten thallium, he called several people and looked in some books. He then told Mrs. Rumsey to take him to another doctor. From the time she got to the first doctor's office until she got to the second doctor, about an hour had elapsed. The second doctor examined Bruce and then took him across the street to the hospital. They were at the hospital for an hour or an hour and a half. They then went home. The child seemed drowsy. She took him back to Dr. Rothenberg, the second doctor. The boy had vomited some before they left the hospital. The child was in pain on the return to the doctor's office. The boy continued to vomit. After being there a short while, the child's eyes began to roll and he turned blue. He was taken to the hospital again. The child expired there.

Mrs. Rumsey said she had never heard of thallium. Her son told her he had eaten some of the poison. The six year old boy said he had knocked the caps off the shelf. He told this to his mother. He had eaten none of the poison. While at the hospital the first time, a nurse pumped Bruce's stomach.

There was nothing on the label that said "Kingtex" if eaten was fatal. Mrs. Rumsey told her husband that anything they would recommend putting in the cabinet

with food and dishes wouldn't be too harmful. Dr. Moise, the first doctor, said there was no antidote.

When purchasing the poison at Minimax, she did not talk to anyone connected with the store about making the purchase. She never, before the purchase, talked to anyone about how poison thallium was. She used the poison on the basis of the label. When she sees the skull and crossbones she thinks of caution. Too, they signify death. At the time she read the label she didn't think it would cause death because of the antidote. Since she knew poison could cause death, that was the reason she took the precautions she did in making use of it. When she stored the poison she put it up on the very top shelf. She took every precaution to see that Bruce was not exposed to it because the label said "Poison". She thinks the only reason Bruce was exposed to the poison was because the Harris boy either knocked it off the shelf or got it off.

Mr. Rumsey was out of town so much, he knew nothing of the incident. He left the use of the poison to Mrs. Rumsey.

From the testimony of the pathologist, who performed an autopsy, and the chemist and toxicologist, who made various analyses, it certainly could be concluded that death resulted from thallium poisoning.

Dr. Rothenberg testified when he first examined Bruce there was no evidence of illness. However, where there had been a possible ingestion of a toxic substance, it is customary to pump the stomach. Bruce's stomach was pumped and washed with 1000 cc of potassium iodide. When the child returned to the office and began having convulsions, intracardiac adrenalin, cardiac message and stimulating drugs were used. They were ineffective and the child died about 6:30 p. m. The doctor said there was one possible antidote but the results of its use are indefinite. It doesn't work all the time. The drug itself is toxic. The witness did not name the drug or the manner of its use. The purpose in pumping

and washing the stomach is to remove the toxic substance before it becomes absorbed into the system. If you remove as much as you can, you can at least prevent some of the toxic reaction. If small amounts of thallium are taken over a long period it causes loss of hair. Acute thallium poisoning effects the central nervous system. It causes nausea, vomiting, convulsions and coma and other things that are related. It affects the respiratory system. His experience was that most of the effects of thallium are in connection with prolonged ingestion. This one appeared to be an acute sensitivity to the drug. Some people are more sensitive to it than others. Usually thallium is slow in acting. Usually you would not have the convulsions within two hours as in this case. The purpose of using iodide is because it will help the system throw off the thallium. This is in a measure an antidote that was recommended and he used it. The witness concluded the child was highly sensitive to thallium. Warm salt water causes vomiting. It is not an antidote in itself, but by causing vomiting it can help. The use of warm salt water is not as effective as pumping the stomach.

Echols Kingtex, as shown on the label, contained 1% thallium sulphate. The balance of the compound consisted of sawdust or small chips of some kind. A chemical analysis of the contents of the bottle purchased showed it contained 1% thallium sulphate.

Dr. Dobson had done research into the effects of thallium and has consulted on a number of cases of thallium poisoning. It affects the central nervous system, the stomach, the intestines and the liver. It was his opinion that in June, 1961, there was no known effective antidote for thallium poison. The only way to do is to rid the body of it while it is possible to do so. The only way to do this is to make the person who has ingested it vomit or pump his stomach as soon as possible. Once the thallium gets into other parts of the system, there is nothing medical science can

do. If there was a case of acute thallium poisoning the only thing you could do in June, 1961, was to employ what is called expectant or supportive therapy, that is, give the patient fluids intravenously, give a drug such as a barbiturate, keep his nutrition up and keep him out of shock if possible. The antidote given on the label is the only one that was available. This witness stated that an antidote can be used to mean anything which is used in the treatment of poison. He regarded vomiting as first aid. "Specific compounds such as British Antilucite, which is used for arsenic, is a specific or near specific antidote which offers some change chemically or otherwise of removing the compounds from the body doing little or no damage. To me, at this state I think we can talk about specific antidotes which specifically block the major part of the toxic reaction." He stated the standard feeling among people is that there is no specific antidote for thallium poisoning. There is no specific antidote for several other substances, including aspirin and certain petroleum products.

It was admitted that this roach poison was registered under the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C.A., Secs. 135–135k, and the label had been approved by the Secretary of Agriculture. Too, it was admitted that the label affixed to the poison bought by Mrs. Rumsey had been accepted by the appropriate authority in accordance with the requirements of the Act. Too, it was admitted that the label complied with the Texas Hazardous Substances Act and had been approved by the State Department of Health as required by said Act, Article 726–1, Vernon's Annotated Penal Code.

The effect of Mr. Echols' testimony was to establish his compliance with the state and federal regulations. Too, he stated that thallium could be expelled through the urine and there was some injection you could give that would aid in the expelling of thallium. He did not state what it was. He stated he kept abreast of the research

done. At first it was permissible to use 3% thallium, but in 1960 it was provided that no more than 1.25% thallium sulphate or 1% thallium (metallic) was allowed. He had heard there was no antidote except such as would induce expulsion of the poison, such as through the urine.

We have not noticed the testimony concerning how much thallium per pound of body weight is thought to be fatal because there is opinion evidence, as above stated, that raised a fact issue on whether thallium poison was the cause of death. There was sufficient evidence to show it did.

Points 1 and 2 assert as against Echols that there was evidence of negligent labeling and of failure to warn. The real contention under both points is that there was no known antidote for thallium poisoning and that to term the use of warm salt water an antidote is negligence. Too, there was negligence not to affirmatively warn that there was no known antidote for thallium poison.

The best we are able to determine, the doctor, testifying that there was no known antidote, used the term "antidote" to mean a method whereby after the poison has been absorbed into the system another chemical of some sort can be used which will in some way block its spreading further through the system by causing the poison to be ejected, thus either eliminating some harm caused or minimizing the harm so as to prevent death. We take it that he terms the use of a means that eliminates the poison from the stomach before it has been absorbed by the body system, such as by pumping the stomach or by in some manner inducing vomiting, as a mere first aid measure to prevent its absorption and this is not encompassed in the term "antidote".

Appellee Echols' position is that he labeled the poison with an antidote printed thereon within the meaning of the definition given by 7 U.S.C.A., Sec. 135; that the label was approved by proper authorities, state and federal, and he was by law re-

quired to use this labeling and as a matter of law he cannot be guilty of negligence. His position is that he could not market his product without the precise label, and if he did so he would be guilty of violating the law.

Appellant's position is as above stated and that the approved labeling was merely a minimum requirement and would not prevent additional warnings such as that there was no known antidote.

The term "antidote" is defined by 7 U.S.C.A., Sec. 135(r) as meaning any practical immediate treatment in case of poisoning and includes first aid treatment. Section 135a of Title 7 U.S.C.A., provides the label should contain a statement of "an antidote for the economic poison." Article 726–1, Sec. 3(d) (1), V.A.P.C., provides that the label shall have the word "poison" prominently printed on it, followed by a "statement of antidote or first-aid treatment for the poison."

While we do not find in the federal statute any specific reference to thallium, there is in the record the "Interpretation with Respect to Pesticides (Economic Poisons) Containing Thallium Compounds Intended for Household Use." This was prepared by the Agricultural Research Service, Department of Agriculture. It is designated "Regulations for the enforcement of the Federal Insecticide, Fungicide and Rodenticide Act." (7 U.S.C.A., Secs. 135–135k). The employees of the Department of Agriculture were given the same authority as the Secretary of Agriculture (7 U.S.C.A., Sec. 135i), if they were so designated by him. This report expressly deals with thallium and after investigation certain regulations were promulgated. Among those was one that provided that the pesticide should contain no more than 1.25% of thallium sulphate, or 1.0% of thallium calculated as the metallic element. This was required to be stated on a label on the container. We shall not notice all of the precautionary statements required for the label, except the antidote, because

it is admitted that they were present. The Department of Agriculture prescribed the "antidote" which we have above quoted, and it was employed on the label used by Echols after it had been expressly approved upon his application.

Article 726–1, V.A.P.C., provides that the label, among other things, shall contain "a statement of antidote or first-aid treatment for the poison." Said article also allows the sale of a mixture or substance containing thallium of not more than 1% expressed as metallic thallium if the label contains specified warnings and a statement of an antidote or first aid treatment. The label used was submitted to the Commissioner of Health of Texas. This Department, in a letter to Echols' attorney, wrote: "I also believe the labeling is in compliance with the labeling requirements of the law * * *" There is no definition of antidote in the Texas statute.

The following are some definitions of the term "antidote" given in two dictionaries: (1) Webster's New International Dictionary, Second Edition, defines antidote as (a) a remedy to counteract the effects of poison, and (b) whatever tends to prevent mischievous effects or to counteract evil that something might produce; (2) The American Illustrated Medical Dictionary, by Dorland, defines antidote thus: 1. a remedy for counteracting a poison. *Chemical*—an antidote that changes the chemical nature of the poison. *Mechanical*—an antidote that prevents the absorption of a poison. *Physiological*—an antidote that counteracts the effects of a poison by producing other effects.

Dr. Rothenberg in his testimony defined an antidote thus: "An antidote—is a substance that will combine with a poisonous substance to reduce its poisonous activity." He further testified that first aid was a part of treatment for poison.

■ We are of the view that there could be no recovery on a basis of implied or express warranty. The product sold was

poison and was knowingly purchased as such for the purpose of using it as an insecticide to kill roaches. It was fit for the purpose for which sold.

■ We are, however, of the view that the trial court erroneously instructed a verdict for the defendant, Echols Manufacturing Company, because there was evidence from which the jury could conclude that such defendant was guilty of negligence in the wording of its label in that the wording would lead a reasonably prudent person to conclude there was an antidote for thallium poisoning and that it consisted of the giving of warm salt water to induce vomiting. There was sufficient evidence to show that this was mere first aid to prevent the absorption by the bodily system of the poison. However, there was no language on the label to indicate that there was no specific antidote, that is, there was no language to indicate that once the poison had been absorbed there was nothing that could be given to counteract the effect of the poison.

■ There is a common law duty on one who markets an inherently dangerous product to fully disclose the extent of the danger in its use and to disclose the measures that may be taken to avoid fatal consequences of its use. It is, of course, true that the economic poison (thallium) was by the label represented to be poisonous and the ordinarily prudent person would know that its ingestion could result in death. However, the ordinarily prudent person also knows that for most poisons there is not only a first aid remedy that will prevent the absorption of the poison by the system, but also for most poisons there is something that may be introduced into the system that will counteract the effect of the poison absorbed. If there is no such agency, it is the duty of the manufacturer to fully inform the public to whom it intends to market its product that there is no such agency.

No case, precisely in point, has been cited to us, nor have we in our extensive research found any. The nearest case in point is that of Pfizer and Company, Inc. v. Branch, 365 S.W.2d 832, 833 (Tex. Civ.App.) dism., w. o. j. In that case the substance named "Combiotic" manufactured by the defendant to be used as an injection in cattle to prevent infection had a label which warned that there might be an allergic reaction and if there was use of it should be stopped. Defendant, however, failed to give an antidote on its label. Upon receiving the injection, several head of cattle died. The court held the warning given was insufficient and that the defendant should have given an antidote on its label.

■ While we find no cases dealing with the failure to warn that there is no specific antidote, we feel that even though poison is known to the ordinary person to be inherently dangerous, there is a common law duty to warn of the full extent of the danger and certainly a poison for which there is no specific antidote has more potential for harm than does a poison for which there is a specific antidote. This case is a good illustration of the last statement. There is an economic poison that is widely used around homes where children play. Despite care to keep it away from them, they do get to it. If ingestion is discovered before absorption, first aid may suffice, but if not then an antidote is necessary. If there is no antidote, nothing can be done. It is to be foreseen that a child may get the poison, take some of it and such will not be known until absorption by the system, particularly a slow acting poison such as thallium. We think this duty is recognized by the above cited case and the following cases from other jurisdictions: Maize v. Atlantic Refining Company, 352 Pa. 51, 41 A.2d 850; Gonzalez v. Virginia-Carolina Chemical Co., 239 F.Supp. 567 (U.S. S.Ct., E. Dist. of S.C.); Hubbard-Hall Chemical Co. v. Silverman, 340 F.2d 402 (1st U.S. Ct. of App.).

■ Appellee Echols urges, however, it cannot be held guilty of negligence for failure to warn because it complied with the U. S. Act regulating the marketing of insecticides as well as the Texas Act regulating the marketing and that the label employed was approved by the appropriate agencies to which authority had been delegated. Neither the State nor the Federal Act purports to change the common law duty to warn. It merely authorizes the marketing of specified economic poisons if the statutes and the regulations promulgated are complied with. Neither Act purports to deal with property rights. It makes it a crime to market such a product without complying with the Act. Failure to comply with the Act would be negligence per se. However, a mere compliance does not as a matter of law, in all cases, mean that the party is free from negligence. Prosser, Law of Torts, Sec. 35, p. 205. Whether there is negligence depends on the facts of each case. We are of the view that the statutes and regulations by the agencies merely set minimum standards. Compliance with the standards is evidence on the issue of negligence. See the following cases: McClanahan v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E.2d 712; Spruill v. Boyle-Midway, Incorporated, 308 F.2d 79 (4th U.S.Ct.App.); Gonzalez v. Virginia-Carolina Chemical Co., supra, Maize v. Atlantic Refining Co., supra; Hubbard-Hall Chemical Co. v. Silverman, supra.

■ There was only a fact issue as to whether Mrs. Rumsey was guilty of contributory negligence in not seeking to give the child warm salt water to induce vomiting. A doctor was only five minutes away from her home. The child was only 3½ years old. The difficulty of successfully administering such to a child of that age, even through the use of force, is a matter of common knowledge.

We are also of the view that at most there was a question of fact as to whether Mrs. Rumsey was guilty of negligence in the manner in which she made use of the poison.

■ Nor do we feel that a court could say as a matter of law that Mrs. Rumsey voluntarily assumed the particular risk involved in this case, that is, using the poison because it does not appear she knew or should have known there was no specific antidote. Halepeska v. Callihan Interests, 371 S.W.2d 368 (Tex.).

We are of the view there was no evidence of probative force of a new and intervening cause. The testimony that the young neighbor child, Mark Harris, told his mother he knocked the poison down is but hearsay. Even if there was evidence of probative force, it would not be a new and intervening cause. It is a happening within the realm of foreseeability and also would at the most be a concurring cause.

The only point of error urged against Freeway Manor Minimax is that there was an implied warranty. As we have held above, there is no implied warranty. The judgment in favor of Freeway Manor Minimax will, therefore, be affirmed.

In the light of another trial as to Echols, we should pass on the points of error relating to the admissibility of certain evidence.

■ We think the fact that Mr. Echols was present at a legislative hearing at which consideration was being given to legislation relating to the use of thallium in insecticides, and heard Dr. Dobson testify there was no known antidote for thallium poisoning, is admissible. It is evidentiary on the issue of Echols Manufacturing Company's being negligent in its labeling of its product.

We are also of the view the court correctly allowed in evidence the interpretive regulation. It is also material on the issue of Echols' negligence.

395

The judgment as to Freeway Manor Minimax is affirmed. As to Echols Manufacturing Company the judgment is reversed and remanded, Associate Justice Peden not participating.