**Gerry Shanelle Hahn PEARSON et al., Appellants,**

v.

**HEVI–DUTY ELECTRIC et al., Appellees.**

**No. 17546.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

April 16, 1981.

Rehearing Denied June 11, 1981.

Murphrey, O'Quinn & Cannon, John O'Quinn, Houston, for appellants.

Tekell, Book & Matthews, Kenneth Tekell, Bill Book, Talbert, Giessel & Stone, Alice Giessel, Henry Giessel, Hicks, Hirsch, Glover & Robinson, Arthur Glover, Jr., Paul Anderson, Jr., Houston, for appellees.

Before COLEMAN, C. J., and DOYLE, J.

DOYLE, Justice.

The widow, children and parents of Connie Pearson, deceased, appeal from a take-nothing judgment rendered in a wrongful death action based on strict products liability law.

Connie Pearson was electrocuted while working on a 7200 volt transformer at a Houston apartment complex. Three defendants are involved in the case. Hevi-Duty Electric (HDE) made the transformer and sold it to Houston Electric Distributing Company, Inc. (HEDCO), which in turn sold it to Mr. Pearson's employer, Russell Electric. McGraw-Edison (MGE), the third defendant, made the fused switch and sold it to HDE which used it as a component part in the transformer.

Liability was based on the failure to warn that the fused switch was live in the open position. This switch is a unique design and when MGE manufactured the such switches they attached a special warning to be placed on the product into which they switch was installed. The pressure sensitive adhesive labels stated: "WARNING FUSE OR SWITCH MAY BE LIVE IN OPEN POSITION." The labels were not attached, but were discarded by HDE when they built the transformers. A substitute warning was employed by HDE, but it did not point out the specific switch design, nor did it mention that the fuse or switch may be live in the open position. The substitute warning placed on the red arc strangler of the fused switch had the words: "HIGH VOLTAGE DO NOT TOUCH." The transformer assembly including the fused switch was enclosed in an insulated box which could only be reached by removing the cover, which was stenciled with this warning: "HIGH VOLTAGE REMOVE WITH HOT STICK." This warning was on both sides of the cover.

Trial was to a jury who answered fifteen special issues finding that: (1) HDE did not fail to adequately warn the deceased of the danger that the switch may be live in the open position; (2) MGE's failure to permanently affix a warning that the fused switch may be live in open position did not expose the user to an unreasonable risk or harm; (3) Connie Pearson voluntarily assumed the risk of using the fuse barehanded when power had been supplied to the fuse; (4) a reasonable manufacturer of the MGE fusing assembly would have anticipated and expected a customer such as HDE would attach to the transformer the warning sign it provided; (5) damages in the amount of $115,000.00 would reasonably compensate the widow and four children of the deceased and; (6) the parents of the deceased were not entitled to damages.

Based upon the jury's findings of no liability the court entered the take-nothing judgment. Appellants filed a motion for new trial, which the court overruled. Appellants present 18 points of error.

By their first point of error, appellants assert the jury's finding to special issue 1 is against the great weight and preponderance of the evidence. This special issue 1 read:

Do you find from a preponderance of the evidence that Hevi-Duty Electric failed to adequately warn the deceased Connie Pearson of the danger that the fuse or switch may be live in open position? Answer "We do" or "We do not".

Answer: We Do Not.

In answer to this special issue the jury first answered: "We do." Later after further oral instruction from the court, the jury deliberated and finally answered: "We do not." The court then rendered the take-nothing judgment.

We deem it appropriate to give a detailed statement of the facts, most of which are undisputed. It should be stated at the outset that no one actually saw the exact manner in which Connie Pearson was electrocuted. One witness concluded that he must have been cocking the fuse. Another testified that he stuck his bare left hand into the transformer immediately prior to being killed. Since all parties tried the case on the theory that Pearson met his death by bringing his hand in contact with the fused switch in some manner, we shall assume that he did for our discussion. A special issue, which we shall discuss later, was requested on this theory.

Pearson was the foreman of the Russell Electric crew which was dispatched to an apartment project to replace a "burned-out" transformer. After shutting off the power at the utility pole, the crew removed and replaced the old transformer with the new transformer manufactured by HDE. Some discussion followed as to how the new transformer should be energized. Pearson, as foreman, decided that the power should be restored prior to closing the fused switch. Since all of the crew were experienced electricians, a question (unanswered by the testimony) arises as to why such a discussion was necessary. The only reasonable deduction is that the crew was faced with an unusual type of transformer with a fusing assembly, the like of which none of them had ever worked on before. Mr. Signaigo, vice president and chief engineer for HDE testified that his engineering department designed the transformer in question and decided to use the MGE fused switch therein. He admitted the MGE furnished the adhesive-backed decals reading: "WARNING, FUSE OR SWITCH MAY BE LIVE IN OPEN POSITION," and that for several years these decals were attached as directed. Thereafter, someone with HDE decided to throw away the MGE warning and replace it with a warning that says nothing about the fuse or switch being "live" in the open position. Mr. Signaigo admitted that the MGE fused switch was unique in design, unusual and strange to people who had not worked with it, in that most switches of a similar nature would be "cold" or "dead" in the open position. The following is typical of Mr. Signaigo's lengthy testimony:

Q. Does any other one of them design their equipment so that the fuse switch is live in the open position?

A. No others that I know of.

Q. So unless Connie Pearson had worked on this type assembly before, then every one he had ever encountered from any other manufacturer was cold in the open position, is that correct?

A. I can't say that. I don't know.

Q. Do you know of anybody else that made one this way?

A. No, I don't.

Q. So if you assumed that he had never worked on a McGraw-Edison one before, then every one he had ever worked around was designed so that it would be cold or de-energized in the open position?

A. I assume so, yes.

Q. You now know that McGraw-Edison designed it this way to be hot in the open position, and that they were aware that this was a unique design, unusual, strange to the people who worked on it, they decided, in big red letters to tell that to whoever is working around the equipment, that

is that this design is different from the ones that you are used to. You know that that is what this warning is for, don't you? Is that right?

A. Yes.

Q. Because McGraw-Edison knew, was in a position to know that a man might be misled into thinking that this fuse was cold, because all the others are. Right?

A. Yes, he might.

While admitting that no specific warning was given as to the fused switch's being live in the open position, Mr. Signaigo testified that he thought the general warnings were adequate. However, he also stated that HDE has resumed using the MGE warning since Pearson's death.

Mr. Roald Amundson, a graduate staff engineer for MGE for 39 years testified that MGE had manufactured the fused switch in question; that the company's engineering marketing and legal departments had held discussions and finally decided upon the wording, size and content of the warning that should accompany the fused switch; that MGE's personnel had taken into consideration the fact that most electrical servicemen have been trained that such a fused switch would be cold in the open position; that to his knowledge MGE was the only company that manufactured such a fused switch; and that MGE, because of the uniqueness of the switch recommended and furnished the warning decals free of charge to its customers because MGE felt that it was an important warning and would promote safety.

■ The seller of a product is legally obligated to provide warnings of dangers that can arise in intended or foreseeable use of the product. *Bituminous Casualty Corp. v. Black & Decker Mfg. Co.*, 518 S.W.2d 868 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r. e.). Warnings must be adequate as to both form and content. The warnings must warn and not just instruct the user. *Bituminous Casualty Corp. v. Black & Decker Mfg. Co.*, supra. The adequacy of a warning cannot be evaluated apart from the knowledge and expertise of those who may reasonably be expected to use the product.

*Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457 (5th Cir. 1976); *Helene Curtis Industries v. Pruitt*, 385 F.2d 84 (5th Cir. 1967) cert. denied, 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968).

■ Whether a warning is adequate in view of the user and the circumstances is normally a question for the jury. *Bituminous Casualty Corp. v. Black & Decker Mfg. Co.*, supra. It has become well established in Texas that the doctrine of products liability is a viable legal concept and our courts are called upon to interpret its various ramifications with increasing frequency. *Helicoid Gage Division of American Chain and Cable Company v. Howell*, 511 S.W.2d 573 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.); *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967); *Shamrock Fuel & Oil Sales Co. v. Tunks*, 416 S.W.2d 779 (Tex.1967).

■ When a product is manufactured for the purpose of use in the stream of commerce, the original manufacturer, that is, the seller, is under an obligation to market a product free from defects and reasonably safe for use by a consumer or other party who is likely to handle it. This duty of the seller is covered by Restatement of Torts (Second) Section 402A (1965) which states:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

This duty has been interpreted as forbidding the seller to market a product which exposes to an unreasonable risk of harm, the consumer, user or someone who would come in contact with the product by reason of working with it through his occupation. Keeton, Products Liability-Inadequacy of Information, 48 Texas Law Rev. 398 (1970). The liability of the seller under Section 402A has been expanded by the courts to not only cover a defective product but a dangerous nondefective one as well, if he places it into the flow of commerce without adequate warning of its dangerous propensity or without adequate instructions for its safe use. *Hamilton v. Motor Coach Industries, Inc.*, 569 S.W.2d 571 (Tex.Civ.App.— Texarkana 1978, no writ). Liability has also been extended to a seller who places an inherently dangerous product into channels of trade and surrenders possession and control thereof to another, if such seller can anticipate that the product will become unreasonably dangerous if the consumer or user is not warned of such danger. *Sharp v. Chrysler Corporation*, 432 S.W.2d 131, 136 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.); *Darryl v. Ford Motor Company*, 440 S.W.2d 630 (Tex.1969); *General Motors Corporation v. Hopkins*, 548 S.W.2d 344, 351 (Tex.1977).

In determining whether the jury's answer is against the great weight and preponderance of the evidence, we must weigh and consider all of the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

The question before the jury, and ultimately this court, was not whether there was an adequate warning of the general dangerous consequences of the presence of high voltage electrical power in the NX fused switch and its surroundings within the transformer, but whether there was adequate warning to put Connie Pearson on notice that the NX fuse or switch may be live in the open position and hence dangerous in such position. Stated another way: Was the general warning adequate where the undisputed evidence revealed that a specific warning would have pinpointed the danger of the fuse being live in the open position?

The evidence in this case shows a strong probability that if the warning prepared and furnished by MGE or a substituted one of the same specific character had been given and heeded, the fatal occurrence would have been avoided. Appellees have raised no contention that the MGE warning was not adequate to put Pearson on notice that the fused switch was live in the open position, a specific condition unique to this particular switch. If the product is not defective but is unreasonably dangerous, such product, if placed in the stream of commerce without adequate notice of the inherent danger, would constitute proof that the manufacturer had violated its duty in the event that it caused a consumer or user injury. Leon Green, Strict Liability Under Sections 402A and 402B: A Decade of Litigation, 54 Tex.Law.Rev. 1185, 1207 (1976).

As a matter of general knowledge, laymen are well aware of the dangerous nature of high voltage electric current. The slightest warning of the presence of such voltage is sufficient to steer the average person away from its presence. However, this is often not the case with an experienced electrician. In this case, we have testimony from the electrical crew and some of the expert witnesses that the switching assembly in the transformer in question was unique. None of the crew with Pearson had worked on such a transformer. It is undisputed that Pearson and the crew knew that electricity at 7200 volts was present in the transformer and that such a situation required careful attention while working therein. The general warning: "HIGH VOLTAGE DO NOT TOUCH," which HDE substituted for the MGE recommended warning admittedly failed to inform Pearson of the unique characteristic of the fused switch being "live" in the open position. Neither Pearson nor members of his crew had faced this situation before, regardless of their expertise in electrical principles. MGE foresaw that this very situation might arise, although it knew and anticipated when it manufactured this fused switch that only trained electricians would be working with the

product. It knew that the switch would be used in high voltage transformers. MGE also knew that since it was the only company making such a fused switch live in the open position) many electricians would be unaware of such unusual propensity. Armed with this knowledge and realizing that serious injury or death could occur unless the trained electrician was warned, MGE designed and attached a warning to cover the precise danger. If there was ever a situation calling for an adequate warning, it was present in this case. Several exhibits show the fused switch in place in the transformer and in the open position. In this position the top of the switch on which the arc strangler was located extended outside of the transformer assembly, away from any other plates, wires or switches. It was necessary to first cock the fused switch and then swing it upward until it engaged the pronged contacts at the top of the fusing assembly before the transformer would become completely energized. The testimony shows that this cocking of the arc strangler could be done by hand without any danger unless the fused switch was live in the open position. It is without dispute that the warning on the fused switch made no mention of its being live in the open position. It would appear that Pearson's electrical expertise was sufficient to warn him that the fused switch would be live in the closed position. Likewise, his past training would lead him to believe that the fused switch would be dead in the open position. It would require a specific warning in clear language to change his evaluation of the fatal danger that confronted him. We hold that HDE's general warning failed to convey to Pearson the specific danger and was therefore inadequate. *Borel v. Fibreboard Paper Products*, 493 F.2d 1076 (5th Cir. 1973); *Rumsey v. Freeway Manor Minimax*, 423 S.W.2d 387 (Tex.Civ.App.—Houston [1st Dist.] 1968, no writ); *Eddleman v. Scalco*, 484 S.W.2d 122 (Tex.Civ.App.—Beaumont 1922, writ ref'd n.r.e.).

The jury's findings that HDE did not fail to adequately warn Connie Pearson of the danger that the fuse or switch may be live in the open position is against the great weight and preponderance of the evidence.

We therefore sustain appellants' first point of error.

■ Appellants' point of error 13 and 14 complain that the jury's affirmative answer to special issue 7 is against the great weight and overwhelming preponderance of the evidence. Special issue 7 and the instruction accompanying it is as follows:

Do you find from a preponderance of the evidence that Connie Pearson voluntarily assumed the risk of using the NX Fuse barehanded when power had been supplied to the NX Fuse?

You are instructed that in order for Connie Pearson to "assume the risk" of such danger, he must have actually known that the fuse was hot in the open position and must have actually and fully appreciated the nature and extent of the danger involved in encountering such dangerous condition, if any, and he must have voluntarily and of his own free will encountered the dangerous condition that caused his death.

Answer: "We do" or "We do not".

Answer: We Do.

■ The doctrine of assumed risk presupposes the existence of four elements: (1) knowledge of the facts consisting the dangerous condition; (2) knowledge that the condition is dangerous; (3) appreciation of the nature and extent of the danger; and (4) voluntary exposure to this danger. *Biscayne Texas Properties v. Miner*, 502 S.W.2d 225 (Tex.Civ.App.—El Paso 1973, no writ). The assumed risk doctrine is indeed a harsh remedy and its application has been rigidly confined. *Ellis v. Moore*, 401 S.W.2d 789 (Tex.1966); *Halepska v. Callihan Interests, Inc.*, 371 S.W.2d 368 (Tex.1963); *Triangle Motors of Dallas v. Richmond*, 152 Tex. 354, 258 S.W.2d 60 (1953).

During the trial of this case, testimony was adduced from which we can conclude that Pearson was in some manner working with the fused switch preparatory to energizing the fuse. This required that the plastic arc strangler, a hollow sleeve which encircles the top of the fused switch, be cocked and then raised from its horizontal position to engage the clips in the switch

box which were wired into the transformer circuit. Apparently Pearson knew that the power had been turned on at the service light pole. He stated to Paul Taylor, a fellow employee, that he was going to energize the fuse. Immediately thereafter, (less than ten seconds) Pearson was electrocuted. The testimony is undisputed that he was a good, experienced electrician and was in charge of the crew on the night of the fatal occurrence. Several other experienced electricians were working with Pearson during the job of replacing the blown transformer with the new one. A fair summary of their testimony concerning the new transformer and the fused switch in question is that none of them had worked on a similar transformer before and that all similar fused switches were dead or cold in the open position. All of the employees testified that there was no warning on the transformer nor the fused switch to the effect that such switch "may be live in open position."

From this factual basis we examine the jury's finding that Connie Pearson assumed the risk of using the NX Fuse barehanded when power had been supplied to the NX Fuse.

The jury was not only limited in its deliberations on this issue by the wording of the issue itself, but especially so by the instruction that was submitted with it. To sustain its finding that Connie Pearson voluntarily assumed the risk involved, the jury had to first find that Pearson actually knew that the fuse was hot in the open position. We can find no evidence to support this conclusion. Likewise, we can find no evidence that Pearson actually and fully appreciated the nature and extent of the dangerous condition of the fuse's being live in the open position. What the evidence really reveals is that he had every reason to believe that the fuse was cold or dead in the open position. The jury also had to find that Pearson voluntarily and of his own free will encountered the dangerous condition, i. e., he knew and appreciated that to place his bare hand on the fuse might cause him serious injury or death because it was live in the open position.

There was some evidence that one witness, Hank Chatron, believed the fused switch was hot in the open position. He states that he discussed this belief in the presence of Pearson and other members of the crew. Yet all other members of the crew testified that they thought the fuse was dead in the open position. All crew members, including Chatrou, agreed that there was no warning on the transformer or the fuse to the effect that the fuse or switch was live in the open position. Thus, it appears that whatever observations or comments Chatrou made concerning the fused switch, they were either not heard, not believed or not understood by Pearson or the other members of the crew. There is nothing in the evidence to suggest that Pearson was anything but a normal, experienced, hardworking electrician and family man, whose job expertise had elevated him to foreman of the crew, under the facts adduced, it is unbelievable that Pearson, in attempting to cock the arc strangler on the fused switch, knew that in the open position, the switch was alive and that he was purposefully grabbing 7,200 volts of electricity with his bare hand and that he would be seriously harmed or killed by doing so. To thus believe would be tantamount to believing that Pearson intended to commit suicide.

Appellees contend that Pearson was an experienced, intelligent electrician and a good serviceman and that as a result of his training would know that because of a common base plate, the fuse in question would be live in the open position and hence dangerous. This contention overlooks the fact that this fuse was unique and that unless adequately warned of the specific danger, no amount of experience and expertise would aid a person dealing with this situation for the first time. Without question Pearson knew of the general danger of working with high voltage and had managed to escape its fatal effects for the 16 years of his electrical career. In *Triangle Motors of Dallas*, supra, and in *Wood v. Kane Boiler Works*, 150 Tex. 191, 238 S.W.2d 172 (1951), the plaintiffs knew of the general dangers that confronted them,

but both were unaware of the specific dangers that led to their injuries. In both of these cases the Texas Supreme Court held that assumed risk did not apply.

We have reviewed all of the evidence adduced in this case, as we are compelled to do, and find that it fails to show that Pearson had a full knowledge and appreciation of the very specific danger of the fused switch's being live in the open position and then put himself in the way of the particular risk. Appellants' points of error 13 and 14 are sustained.

Many other points of error are raised by appellants involving oral instruction to the jury, improper jury argument, failure to grant a mistrial and errors in apportioning jury challenges. These points need not now be considered in view of our remand and are not likely to occur on retrial.

The special issues of negligence and proximate cause in this case were predicated on special issue 1, the answer to which we have determined to be against the great weight and preponderance of the evidence. Appellants were denied the opportunity to secure favorable findings on these issues since the jury was not required to answer them in view of their negative finding on special issue 1. Procedurally, then, appellants are entitled to a new trial under our Supreme Court's holding in *Strauss v. LaMark*, 366 S.W.2d 555 (Tex.1963).

We have considered the briefs submitted by all of the appellees. We have concluded that the entire cause should be reversed and remanded and it is so ordered.